Laurie Berke-Weiss [LB-3445]
Berke-Weiss & Pechman LLP
488 Madison Avenue
New York, NY 10022
(212) 583-9500
Attorneys for Plaintiff

Judge Berman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'07 CIV 5985** (RMB)

----------------------------------------------------------

SUSAN KORRY,

                         Plaintiff,

            v.

INSTANT PRODUCTS INTERNATIONAL INC.,
ROTHFOS CORPORATION, RoCORP TRADING AG,
NEUMANN GRUPPE GmbH, NEUMANN
KAFFEE GRUPPE GmbH, IPI INSTANT PRODUCTS
INTERNATIONAL GmbH, and
KLAAS VAN DER KAAIJ,

                        Defendants.

----------------------------------------------------------X

**COMPLAINT**

ECF CASE

PLAINTIFF
DEMANDS A
TRIAL BY JURY

RECEIVED
JUN 2 5 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Susan Korry ("Korry" or "Plaintiff"), by her attorneys, Berke-Weiss &

Pechman LLP, complaining of Defendants Instant Products International Inc., Rothfos

Corporation, RoCorp Trading AG, Neumann Gruppe GmbH, Neumann Kaffee Gruppe

GmbH, IPI Instant Products International GmbH (collectively referred to as the

"Rothfos Defendants"), and Klaas van der Kaaij, alleges:

### NATURE OF THE ACTION

1.     This action is brought to remedy discrimination on the basis of gender and

retaliation in the terms, conditions, and privileges of employment under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*; the New York State

Human Rights Law, New York Executive Law § 290, *et seq.* (the "Executive Law"); as

well as claims of breach of contract, unjust enrichment, promissory estoppel, and

*quantum meruit.*

2.      Defendants' actions were unlawful, and Plaintiff brings this action for injunctive and declaratory relief, compensatory damages, attorneys' fees, and other appropriate equitable and legal relief.

## JURISDICTION

3.      Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343, Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law, Executive Law § 290 *et seq.*, and New York common law.

## JURISDICTIONAL PREREQUISITES

4.      Jurisdiction of this Court is proper under 28 U.S.C. § 1332(a)(1), because the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.

5.      Plaintiff filed a timely charge of discrimination against defendant with the Equal Employment Opportunity Commission (the "EEOC") on or about April 21, 2005, complaining of the acts of discrimination alleged herein.

6.      On or about June 14, 2007, the EEOC issued plaintiff a Notice of Right to Sue, informing her of her right to sue defendant in federal court.

7.      This Complaint was filed within 90 days of receipt of the Notice of Right to Sue.

8.      Plaintiff has complied fully with all prerequisites to jurisdiction in this Court.

## VENUE

9.      Venue for this action in the Southern District of New York under 28 U.S.C. § 1391 is appropriate as the principal place of business of defendant and the office where plaintiff worked at the time the unlawful discrimination occurred is located in the Southern District of New York.

## PARTIES

10.     Plaintiff Korry resides in Ontario, Canada.  She is an accomplished executive with over twenty years of experience in international trade, supply chain management, sales, procurement, and marketing.

11.     Defendant Instant Products International Inc. ("IPI") is a corporation duly organized and existing under the laws of the State of New York with a principal place of business located at 10 Bank Street, Suite 690, White Plains, New York 10606.

12.     Defendant Rothfos Corporation ("Rothfos") is a corporation duly organized and existing under the laws of the State of New York with a principal place of business located at 10 Bank Street, Suite 690, White Plains, New York 10606.

13.     Defendant RoCorp Trading AG ("RoCorp") is a foreign corporation organized under the laws of Switzerland with a principal place of business at Bahnhofstrasse 22, CH-6301 Zug, Switzerland.

14.     Neumann Gruppe GmbH ("NG") is a foreign corporation organized under the laws of Germany with a principal place of business at Am Sandtorkai 4, 20457 Hamburg, Germany.

15.     Neumann Kaffee Gruppe GmbH ("NKG") is a foreign corporation organized under the laws of Germany with a principal place of business at Am Sandtorkai 4, 20457 Hamburg, Germany.

16.     IPI Instant Products International GmbH ("IPI GmbH") is a foreign corporation organized under the laws of Germany with a principal place of business at Am Sandtorkai 4, 20457 Hamburg, Germany.

17.     Klaas van der Kaaij ("van der Kaaij"), at all times material herein, is the Chief Executive Officer of Defendant Rothfos and is a resident of Briarcliff Manor, New York.

## FACTS

18.     NG is the holding and management company for NKG. NKG has 54 companies worldwide dedicated to the procurement and sale of coffee, and is one of the leading green coffee specialists in the world. NKG employs approximately 2100 employees and has 42 operative units in 26 countries. Each company is run according to the Neumann "strategic plan."

19.     On information and belief, Rothfos is a wholly-owned operating company of NG and/or NKG.

20.     On information and belief, IPI is a wholly-owned operating company of NG and/or NKG that was formed to be "one Brand for the world-wide activities of the trade of soluble coffee," described by NKG as "an important strategic approach for NKG."

21.     IPI was created as part of NKG's business plan to "achieve world-wide corporate branding for the soluble coffee business division of Neumann Kaffee Gruppe," as stated in Addendum 1 to the Instant Products International Concept Paper, dated January 31, 2002 ("IPI Concept Paper"). The IPI Concept Paper also states, "The newly-founded soluble unit will handle all soluble business for Neumann Kaffee Gruppe world-wide," adding that van der Kaaij was named as a member of the IPI Worldwide Advisory Board, with direct oversight of Korry. *Id.*

22.     Rothfos and IPI also had centralized control of labor relations whereby they followed uniform policies, standards and common management, including van der Kaaij, Jens Sorgenfrei ("Sorgenfrei"), David Neumann ("D. Neumann"), NKG Speaker of the Board, and Michael Neumann ("M. Neumann"), Chairman of NG's Supervisory Board.

4

23.    Throughout Korry's tenure at Rothfos and IPI, Rothfos Defendants collectively acted as a single employer, exercising control over the selection of all employees, paying wages, and retaining the power of dismissal of all employees as well as control over the employees' conduct.

24.    Korry's immediate supervisor, Sorgenfrei, served as Head of Advisory Board for IPI, Acting General Manager for IPI GmbH, and was a Board Member for NKG.

25.    Rothfos Defendants also utilized the services of the same company attorney, Igor Krol ("Krol"), of Krol & O'Connor, when dealing with employee issues for the Rothfos Defendants.

26.    During her employment at Rothfos and IPI, "Rothfos Corp. & Subsidiaries" administered Korry's compensation and benefits, including paychecks, commissions, non-discretionary bonuses, health benefits, and 401(k) plan.

27.    From 2002 forward, RoCorp (Switzerland) purchased coffee from Colombia and sold it to IPI, who in turn sold the coffee to the Starbucks Coffee Company in the United States.

28.    The operation and management of NG, NKG, IPI, Rothfos, and IPI GmbH were intertwined, and together the Rothfos Defendants exercised control over Korry's employment.

29.    Korry was recruited by Rothfos as a Trader in November 1997 and began work in June 1998, reporting to van der Kaaij. She was the first woman to hold this position at Rothfos.

30.    Within one year of employment at Rothfos, Korry built the new Rothfos Soluble Coffee division into the largest independent importer of instant coffee in North America with an average yearly net income totaling over $3.85 million, including an

5

average yearly net income of over $2 million relating to the Starbucks' soluble coffee business alone.

31.     On January 1, 2002, Korry was named Co-Chief Executive Officer of IPI ("Co-CEO"). Korry's promotion to Co-CEO was first proposed by M. Neumann, Chairman of NK and/or NKG's Supervisory Board. Although Korry reported to Sorgenfrei, she continued to work in Rothfos's White Plains office where IPI did business in the United States, and where Korry interacted daily with van der Kaaij.

32.     IPI and Rothfos operated out of the same White Plains location, where their employees work side by side. The workspace in the White Plains office consisted of an open room, called the "trading room," in which desks were organized in the shape of a rectangle so that employees faced each other.  Korry's desk was positioned on one side of the room, van der Kaaij's desk was on the opposite side of the room, and the desks of other traders, including Jeff Mass ("Mass"), Manager of Arabica Coffee at Rothfos and General Manager of RoCorp, Dan Dwyer ("Dwyer"), Manager of Robusta Coffee at Rothfos, and Ed Wakeham, ("Wakeham"), Trader of Decaffeinated Coffee at Rothfos, were positioned in between Korry and van der Kaaij. The trading room's design meant that employees worked in close quarters, ensuring that conversations amongst the traders were audible to all within the trading room and beyond.

33.     On March 5, 2003, Thomas Minogue signed the "Application for Alien Employment Certification" for Korry, a Canadian citizen, to permit her to renew her visa, wherein the "Occupational Title of Person Who Will Be Alien's [Ms. Korry's] Immediate Supervisor" is identified as "Executive Director, Rothfos Corporation." This document was filed by Rothfos with the U.S. Department of Justice, Immigration and Naturalization Service, and declared "under penalty of perjury to be true and correct" by Thomas Minogue ("Minogue"), Chief Financial Officer of the Rothfos Corporation.

34.    On June 6, 2003, van der Kaaij wrote an "Employment Verification Letter" to be filed with Korry's Visa application to the Department of Homeland Security. The letter, written on Rothfos Corporation/NKG letterhead, and signed by van der Kaaij in his capacity as Rothfos's CEO, states: "This is to certify that Rothfos Corporation has employed Ms. Korry as a Coffee Trader over the past five years."

35.    On April 27, 2004, Thomas Minogue directed an H-1B Extension of Stay Petition to the U.S. Department of Homeland Security. The petition, written on Rothfos Corporation/Neumann Kaffee Gruppe letterhead and submitted by Minogue in his capacity as "Instant Products International/Rothfos Corp. Chief Financial Officer," states that Korry's "professional services . . . continue to be required in this organization. "

36.    Throughout her tenure at Rothfos and IPI, Korry had frequent and consistent contact with Sorgenfrei, as well as contacts with M. Neumann, and D. Neumann.

37.    Sorgenfrei visited the White Plains office on a quarterly basis, and Korry frequently attended meetings in Germany, New York and Florida with Sorgenfrei, M. Neumann and D. Neumann.

38.    While working at Rothfos, Korry was under the direct supervision of van der Kaaij. In addition, Sorgenfrei was designated as Korry's "coach," who served as the intermediary between Rothfos and M. Neumann.

39.    When Korry first began working for Rothfos, van der Kaaij promised Korry that she would receive a yearly non-discretionary bonus of ten (10) percent, based on all soluble coffee and beverage related ingredient sales ("non-green coffee sales"), as well as ten (10) percent of the twenty (20) percent of Starbucks soluble coffee revenue. Approximately one year after she began working for Rothfos, van der Kaaij

7

increased Korry's non-discretionary bonus percentage in reference to the Starbucks soluble coffee revenue to ten (10) percent of twenty-five (25) percent of Rothfos' sales revenue from the Starbucks account.

40.    Throughout her tenure, any non-discretionary bonuses received by Korry were subject to approval by van der Kaaij, Sorgenfrei and M. Neumann. Korry was required to submit IPI's accounting sheets with the yearly revenue and bonus structure to van der Kaaij and Sorgenfrei for approval in order to receive the non-discretionary bonuses.

41.    Once Korry was named Co-CEO in 2002, Sorgenfrei authorized additional non-discretionary bonus payments to Korry based on IPI's sales revenue. Korry was to receive ten (10) percent of IPI's sales revenue each year, but these payments were never made to Korry.

42.    As Co-CEO of IPI, Korry was not paid a salary commensurate with the men employed by Rothfos and IPI at her level, nor was she provided with benefits equal to the men at her level.

43.    From the time Korry joined Rothfos until she was terminated, Korry was subjected to constant sexual harassment at the office, and at business meetings -- both home and abroad, at conventions, and at company parties and gatherings.

44.    Defendants implemented a "sexual harassment" policy created by Krol, which was openly treated as a joke by a male group of Rothfos employees, and by Krol himself. When asked to sign off on the policy, van der Kaaij, Maas, Dwyer and Wakeham joked that they were afraid that "someone's going to call Igor [Krol]." After the policy was enacted, these men would say, "What are you going to do, tell Igor [Krol]?" whenever another employee would object to their offensive behavior.

8

45.    Throughout Korry's employment by Defendants, van der Kaaij engaged in various acts to create a hostile work environment for Korry because of her sex. These acts included, *inter alia*:

(a)    Taking several male trade desk employees, including Mass, Dwyer, and Wakeham to a local Chinese massage parlor where they paid to be masturbated by the masseuse. After these visits, the men, including van der Kaaij, would return to the office and discuss with Korry the "special massage" they had received.

(b)    Pushing Korry into the outdoor pool during an annual summer party attended by NKG employees at van der Kaaij's home. When Korry went into the house to dry off, van der Kaaij grabbed Korry and forced his tongue down her throat. On information and belief, van der Kaaij subjected another female colleague to the same treatment as Korry at the party, and the colleague reported the incident to D. Neumann.

(c)    Grabbing Korry and again trying to kiss her during an annual company Christmas party in December, 2000. Later that night, van der Kaaij expressed his anger at seeing Korry speaking to another man by throwing a large piece of ice at Korry. The ice hit Korry in the head.

(d)    Continually pressing Korry to have sex with him at a work- related conference in Colombia in November 2002. Despite Korry's refusal, van der Kaaij was undeterred. He continued to harass Korry throughout the business trip, even going as far at to bang on Korry's hotel room door at approximately three o'clock in the morning, demanding that she let him in.

(e)    From 1999 on, frequently calling Korry on her home and cellular phones, remarking on her physical appearance, including how "good" she looked on a given day and stating, among other things, that he would "prefer if [she] wore [her] hair up " rather than down.

(f)    Masturbating during one telephone call to Korry, in January 2002, while telling Korry that he "needed" her, that he wanted to "get inside" her, that he would "be very gentle" with her and would "go slow." Van der Kaaij stopped only when his young daughter walked into the room.

(g)    Korry's personal life was the subject of many of van der Kaaij's inappropriate remarks in the office and over the phone. For example, in one telephone conversation van der Kaaij told Korry that he thought she and Mass would "make a good couple" and that van der Kaaij could "help get [Mass and Korry] together." Van der Kaaij then informed Korry that he would set her up with Mass, with whom he had been friends for years, but that he wanted to "have" her first.

(h)     Van der Kaaij put his hand up the skirt of another female Rothfos employee during a company Christmas party in 2002, in full view of everyone, including Korry.

(i)     When Korry was alone in the office with van der Kaaij, van der Kaaij would approach Korry at her desk, grab her shoulders and begin massaging them. On many occasions, van der Kaaij also tried to kiss Korry. On one occasion, when they were alone, van der Kaaij cornered Korry in the  office kitchen by the refrigerator so that she could not get away. He then grabbed Korry by her waist and began kissing her against her will.

(j)     Van der Kaaij knew that Korry could not quit because she was still a Canadian citizen and, at the time, she had only a H1B visa allowing her to work only for NKG. Van der Kaaij often told Korry that he would prevent her from obtaining a green card because he didn't want her to leave NKG. Defendant van Der Kaaij had sufficient authority and power to carry out such personnel decisions, and as a result, Korry felt "trapped."

46.     Rothfos also fosters and condones an environment replete with pornography. For example, van der Kaaij sent a frequent barrage of dirty and pornographic emails to employees on the trade desk, including Korry. Rothfos continually condoned employees viewing pornography on their office computers. In fact, while viewing pornographic material on his computer, van der Kaaij invited all the employees to his desk to look at the images with him. In the presence of Korry, the other traders made comments such as, "wow!" and "look at her."

47.     The chauvinist contempt of Rothfos Defendants' male employees for Korry is exemplified by their constant inappropriate comments and actions, including *inter alia,* the following:

(a)     In December 1999, Korry was in a taxi with van der Kaaij, Dwyer, and Coleman Cuff ("Cuff"), a trader at Rothfos, heading to a New York restaurant to meet with other business colleagues. In the cab, van der Kaaij took out two joints of marijuana and lit them in the cab. Van der Kaaij then told Cuff to pay the driver to "shut up." Van der Kaaij stated that he could "do whatever I want" because "who's gonna stop me?"

(b)     In 2003, Korry was at a business meeting in California. At the meeting, van der Kaaij grabbed one of the female buyer's legs underneath the table while

Mass joined him in grabbing her other leg. Later that night, van der Kaaij and Wakeham went to a strip club while Mass took the female buyer home.

(c)     An email from Mass to Korry dated February 28, 2003 read, in part, "I forgive you for being so nasty to me and I also ask forgiveness if I was too tough. But I can assure you that it was only constructive criticism! Nothin' personal blondie!!!"

(d)     On July 24, 2003, Mass handed a business document to Korry. On it, he had written a personal note which read, "Here Sweetheart. Thinking of you."

(e)     On February 4, 2004, Mass wrote to Korry via email:

> Dearest Susan:
>
> Not to step on those delicate (manicured) toes of yours, but do you think you could schedule most of the soluble Thurs?

Mass concluded the email with "Let me know snooze-ie!!"

(f)     Mass bragged about affairs he had with women from, among other companies, Nestle, the Colombian Coffee Federation, Starbucks and The Rainforest Alliance.

(g)     On a regular and persistent basis throughout Korry's employment, approximately 7-10 times per week, van der Kaaij, Mass, Dwyer and Wakeham joked about "my cock," alluding to a coffee trader in the industry named Michael Hoch ("Hoch"). They would make comments such as, "Did you see my cock in the washroom? How is he doing?" "Where's my cock?" "How's my cock? I hear he has a short position." Korry continually objected to these remarks but the men just laughed and persisted in making the offensive, inappropriate and harassing statements, even directing their comments to Korry such as, "hey, Susan, did you see my cock?" and "Susan, do you want to see my cock?" Krol, the drafter of the Rothfos sexual harassment policy, witnessed this behavior and reacted by laughing and stating in Korry's presence, "What, should I do anything about this?"

(h)     Van der Kaaij was known in the industry to have extra-marital affairs. Van der Kaaij even boasted about a long-time affair he had with a Banker at Brown Brothers Harriman, bragging that he received inside information about NKG's competitors from her.

(i)     Van der Kaaij highlighted a portion of the sexual harassment policy that read "unwelcome requests for sexual favors, and other unwelcome oral or physical contact of sexual nature constitute sexual harassment" in yellow highlighter. Van der Kaaij handed the policy to Korry and advised her to "read it," laughing at her expense.

(j)     During one of D. Neumann's visits to Rothfos' White Plains offices, he commented aloud "is there anyone new to look at in here."  During the same visit D. Neumann removed Mass' license plate frame from Mass' company car and replaced it with a frame of two naked women, writing on his plate, "Divorced, Gay, and Proud."

48.     Korry made repeated complaints to van der Kaaij, Sorgenfrei, and Krol about the hostile work environment at the White Plains office.  For example, when Korry complained to Sorgenfrei at a conference in Boston in April of 2003, Sorgenfrei responded that the harassment would not happen if Korry moved to Hamburg.

49.     In compliance with Rothfos' sexual harassment policy, advising employees "who believe they have been sexually harassed" to report the matter directly to the attention of Krol, Korry contacted Krol in February 2004, telling him he needed to come to the office to see and observe the harassing environment.  Previously, Krol personally observed harassing and inappropriate behavior at company functions which he attended, including van der Kaaij's summer parties and Christmas dinners. Notwithstanding his first-hand knowledge of the hostile work environment, Krol took no known action to rectify the situation.

50.     On February 23, 2004, Korry wrote an email to Sorgenfrei, detailing the hostile work environment at the White Plains office.  Korry stated that she could not continue to put up with the "daily harassment," and that she was being "ganged up on" by the boys' club of van der Kaaij, Mass and Dwyer.

51.     Guenter Brockhaus ("Brockhaus"), a member of the Board of Management of NKG, spoke with Korry by telephone to discuss her employment in White Plains in June 2004.

52.     Despite Korry's complaints about the long-standing, pervasive hostile work environment, the offensive behavior continued unabated, and consciously ignored by Defendants' management.

53.    Due to the hostile work environment at the White Plains office, Korry drafted a "resignation letter," dated June 27, 2004.

54.    On June 28, 2004, Sorgenfrei called Korry and begged her not to resign. During the telephone call, Korry informed Sorgenfrei that she was considering resignation due to the deteriorating working conditions at the White Plains office and because the stress of the hostile work environment was causing her to become ill. In an effort to retain Korry as an employee, Sorgenfrei told Korry to take the remainder of the week as vacation time and invited her to visit Brockhaus and Sorgenfrei in Hamburg to discuss the harassing environment at the White Plains office. During Korry's telephone conversation with Sorgenfrei, Korry rescinded her letter of resignation dated June 27, 2004 and agreed to fly to Hamburg to meet with Brockhaus, Sorgenfrei, and D. Neumann to discuss a solution to the hostile work environment at the White Plains office.

55.    Korry continued to work during her "vacation" the week of June 27, 2004 and beyond by working remotely outside the White Plains office. She continued to function as Co-CEO of IPI in White Plains, managing the company's global operations on a daily basis. Korry approved checks, made purchases and sales and performed all other duties of Co-CEO, while continuing to be paid at her usual rate.

56.    On July 4, 2004, Korry flew to Hamburg at the invitation of D. Neumann, where she had several meetings with Sorgenfrei and Brockhaus during her four day trip. Sorgenfrei and Brockhaus both acknowledged that Korry was being treated inappropriately at the White Plains office, but responded that they could not "protect or support" her "in that environment." Rather than address the hostile work environment in White Plains, the only option presented to Korry for continued long-term employment with Defendants was to uproot her from her position as IPI Co-CEO

and move her to Hamburg to work for IPI GmbH, reporting to Sorgenfrei and D. Neumann, where she would receive a demotion and a pay cut.

57.    During her trip to Hamburg, Korry also met with D. Neumann to discuss the situation in White Plains. D. Neumann also acknowledged that Korry was treated inappropriately. He stated that van der Kaaij would not be fired because he "makes a lot of money" for NKG and that "he knows there is a problem in White Plains" but that he needed more time to "fix it." He also stated, "you don't expect us to fire [van der Kaaij], do you?" Korry was again told that the company could not "protect" her in White Plains and that the only solution was for her to move to Germany.

58.    Korry continued to work as Co-CEO of IPI during and after her trip to Germany, while continuing to negotiate with Defendants for an equitable offer that would remove her from the hostile work environment at the White Plains office.

59.    On August 2, 2004 at 11:43 a.m., Korry received an email from D. Neumann and Sorgenfrei, purporting to terminate her employment with NKG. The email stated that "a field for reasonable negotiation does not seem evident anywhere." D. Neumann and Sorgenfrei thanked Korry for her "good work and business development over the years" and suggested that she contact Minogue, "concerning any pending details or issues."

60.    Korry responded to D. Neumann and Sorgenfrei the same day (August 2, 2004) at 11:57 a.m., stating "In reference to your email am I correct in assuming that you are terminating my employment...?" Korry subsequently sent an email to Minogue at 12:32 a.m. stating, "I have not heard anything back from either David [Neumann] or Jens [Sorgenfrei]. Am I to assume that I am fired?"

61.    On August 2, 2004, Brockhaus sent Korry an email asking her to "clarify" her employment status.

62.    On August 3, 2004, Korry emailed a response to Brockhaus:

> If the Company is unwilling to negotiate equitable terms for
> me to relocate to Hamburg, or fix my situation in White
> Plains, where as you know harassing behavior is the norm,
> then the Company will have to terminate my employment.

63.    The same day, at 9:45 a.m., Korry met with Krol at his offices in New York. Krol stated that sometimes when people work too closely together, they often get sick of one another and need some time apart to "appreciate" the situation. Krol used his relationship with his wife as an analogy for Korry's relationship with van der Kaaij, stating that when he and his wife argue, his wife will take a trip to Germany where she can "calm down" and "see the situation more clearly." Krol also told Korry how "fond" he and van der Kaaij were of her. Krol suggested that Korry take the day off, "get a massage," "get [her] nails done" and to think about her "history and future with the company."

64.    Later on August 3, 2004, at approximately 5 p.m., Korry received a phone call from Krol asking if she was free for dinner that evening. Korry stated that she had plans but would meet him afterwards. Krol responded that they could "do this tomorrow" but that he would like to "finish things tonight." They agreed to meet at 8 p.m. Krol called Korry at approximately 7:40 p.m. and told her to meet him at the Orsay restaurant at 8:00 p.m.

65.    When Korry arrived at Orsay at 8 p.m., she came face to face with her harasser, van der Kaaij, who was seated alongside Krol at their table. Korry noted her surprise at seeing van der Kaaij, to which van der Kaaij responded that "of course" he "should be" there.

66.    At the dinner, Krol told Korry that the company did not want to "throw the child out with the dirty bath water," and offered Korry a position at the White

Plains office working alongside Minogue. She would no longer be Co-CEO of IPI or Global Commercial Manager of IPI and IPI GmbH. Korry would receive the same salary, but her non-discretionary bonus would become discretionary and she would lose her title and not be allowed to trade a position. This constituted a significant demotion and pay cut for Korry. Krol then advised Korry that as a pre-condition to receiving the job, Korry would also be required to sign an undated letter of resignation which Krol would hold onto until he felt the time was right to "destroy it." Korry refused to do so.

67.     On August 4, 2004, Sorgenfrei sent Korry a letter terminating her employment.

68.     Defendants' actions were unlawful, and Plaintiff brings this action for injunctive and declaratory relief, compensatory damages, attorneys' fees and other appropriate equitable and legal relief.

### FIRST CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Sex Discrimination under Title VII)

69.     Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 68 as if fully set forth at length herein.

70.     Title VII of the Civil Rights Act of 1964 prohibits discrimination in compensation because of sex.

71.     Beginning in 2002, when Plaintiff was appointed Co-CEO of Defendant IPI, she was not paid a salary commensurate, or provided with benefits equal to, the men at her level.

72.     Rothfos Defendants discriminated against Plaintiff in violation of Title VII because she was not paid on par with other similarly situated employees.

73.    As a result of Rothfos Defendants' failure to pay Plaintiff a salary commensurate with those of her male peers, she suffered loss of earnings.

74.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, humiliation, and loss of reputation.

75.    Rothfos Defendants acted intentionally and with malice and reckless indifference to Plaintiff's rights under Title VII and are thereby liable to Plaintiff for compensatory damages under the Title VII.

## SECOND CLAIM AGAINST ROTHFOS DEFENDANTS
### (Sex Discrimination under New York Executive Law § 296)

76.    Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 75 as if fully set forth at length herein.

77.    Section 296(a) of the New York Executive Law prohibits discrimination in compensation because of sex.

78.    Beginning in 2002, when Plaintiff was appointed Co-CEO of Defendant IPI, she was not paid a salary commensurate, or provided with benefits equal to, the men at her level.

79.    Rothfos Defendants discriminated against Plaintiff in violation of the Executive Law because she was not paid on par with other similarly situated employees.

80.    As a result of Rothfos Defendants' failure to pay Plaintiff a salary commensurate with those of her male peers, she suffered loss of earnings.

81.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, humiliation and loss of reputation.

82.    Rothfos Defendants acted intentionally and with malice and reckless indifference to Plaintiff's rights under the New York Human Rights Law and are thereby liable to Plaintiff for compensatory damages under the New York Human Rights Law.

### THIRD CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Hostile Work Environment under Title VII)

83.    Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 82 as if fully set forth at length herein.

84.    Plaintiff was a member of the class protected by Title VII.

85.    Rothfos Defendants are "employers" within the meaning of Title VII.

86.    Pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e *et seq.*, it is an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex.

87.    From the time Korry joined Rothfos until she was terminated, Korry was subjected to constant sexual harassment at the office, at business meetings and conventions, both at home and abroad. While at work, Korry endured a constant barrage of sexually explicit remarks and pornographic images – incited and encouraged by van der Kaaij. Her colleagues made constant inappropriate remarks of a sexual nature, and van der Kaaij continuously pursued and propositioned Korry. Despite her

complaints to Krol, the behavior continued, and Rothfos Defendants failed to take any corrective action.

88.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation.

### FOURTH CLAIM AGAINST ROTHFOS DEFENDANTS
### (Hostile Work Environment under New York Executive Law § 296)

89.    Plaintiff hereby realleges each allegation contained in Paragraphs 1 through 88 as if fully set forth at length herein.

90.    Plaintiff was a member of the class protected by the Executive Law § 296.

91.    Rothfos Defendants are "employers" within the meaning of the Executive Law.

92.    Section 296(1)(a) of the New York Executive Law provides:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

93.    From the time Korry joined Rothfos until she was terminated, Korry was subjected to constant sexual harassment at the office, at business meetings and conventions, both at home and abroad.  While at work, Korry endured a constant barrage of sexually explicit remarks and pornographic images – incited and encouraged by van der Kaaij.  Her colleagues made constant inappropriate remarks of a sexual nature, and van der Kaaij continuously pursued and propositioned Korry.  Despite her

complaints to Krol, the behavior continued, and Defendants failed to take any
corrective action.

94.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has
suffered and will continue to suffer substantial losses, including loss of past and future
earnings, and has suffered other monetary damages and compensatory damages for,
*inter alia,* mental anguish, emotional distress and humiliation.

### FIFTH CLAIM AGAINST ROTHFOS DEFENDANTS
### (Retaliation under Title VII)

95.    Plaintiff repeats and realleges each allegation contained in paragraphs 1
through 94 as if fully set forth at length herein.

96.    Under Title VII, in order to present a *prima facie* case of retaliation, a
plaintiff must show:

> [E]vidence sufficient to permit a rational trier of fact to find (1)
> that [the plaintiff] engaged in protected participation or
> opposition under Title VII, (2) that the employer was aware of
> this activity, (3) that the employer took adverse action against the
> plaintiff, and (4) that a causal connection exists between the
> protected activity and the adverse action, i.e., that a retaliatory
> motive played a part in the adverse employment action.

*Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199 (2d Cir. 2006).

97.    Rothfos Defendants discriminated against Plaintiff in violation of Title VII
when they terminated her because of her complaint of sexual harassment to the Rothfos
Defendants' executives.

98.    As a result of Korry's termination, she suffered the loss of earnings as well
as commissions and non-discretionary bonuses she earned on various profitable
accounts.

99.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has
suffered and will continue to suffer substantial losses, including loss of past and future

earnings and other employment benefits, and has suffered other monetary damages and compensatory damages for, *inter alia*, mental anguish, emotional distress, humiliation, and loss of reputation.

100.    Rothfos Defendants acted intentionally and with malice and reckless indifference to Plaintiff's rights under Title VII and are thereby liable to Plaintiff for compensatory damages under Title VII.

### SIXTH CLAIM AGAINST ROTHFOS DEFENDANTS
### (Retaliation under New York Executive Law § 296)

101.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 100 as if fully set forth at length herein.

102.    Section 296(e) of the Executive Law contains the following prohibition against retaliation:

> It shall be an unlawful discriminatory practice for any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article.

103.    Rothfos Defendants discriminated against Plaintiff in violation of the Executive Law when they terminated her because of her complaint of sexual harassment to Rothfos Defendants' executives.

104.    As a result of Korry's termination, she suffered the loss of earnings as well as commissions and non-discretionary bonuses she earned on various profitable accounts.

105.    As a result of Rothfos Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings and other employment benefits, and has suffered other monetary damages

and compensatory damages for, *inter alia,* mental anguish, emotional distress, humiliation, and loss of reputation.

106.    Rothfos Defendants acted intentionally and with malice and reckless indifference to Plaintiff's rights under the Executive Law and are thereby liable to Plaintiff for compensatory damages under the Executive Law.

### SEVENTH CLAIM AGAINST DEFENDANT VAN DER KAAIJ
### (Sex Discrimination Under New York Executive Law § 296)

107.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 106 as if fully set forth at length herein.

108.    Korry was a member of the class protected by New York Executive Law § 296.

109.    Defendant van der Kaaij had sufficient authority and power to carry out personnel decisions to be subject to individual liability under the Executive Law.

110.    Under Executive Law § 296(6), it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

111.    Defendant van der Kaaij is liable under the Executive Law as an aider and abettor of the discrimination against Korry.

112.    Defendant van der Kaaij, on behalf of and with Rothfos Defendants' permission, engaged in unlawful discrimination against Plaintiff.

113.    As a result of van der Kaaij's discriminatory acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings, and has suffered other monetary damages and compensatory damages for, *inter alia,* mental anguish, emotional distress, and humiliation.

114.    Defendant van der Kaaij acted intentionally and with malice and reckless indifference to Plaintiff's rights under the Executive Law and is thereby liable to Plaintiff for compensatory damages under the Executive Law.

### EIGHTH CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Breach of Contract for Commissions)

115.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 114 as if fully set forth at length herein.

116.    Federal case law has recognized that implicit in every contract is "a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (1995). This covenant incorporates "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62 (1987). In particular, the covenant includes a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389.

117.    At all times relevant to the Complaint, Plaintiff had an agreement with Rothfos Defendants with regard to commissions, which constituted a contract subject to the covenant of good faith and fair dealing.

118.    Plaintiff was promised a yearly commission of ten (10) percent of twenty (20) percent of all IPI instant coffee and ingredient sales revenue, and later, twenty-five (25) percent of the sales revenue earned from the Starbucks account.

119.    In addition, when Plaintiff became Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH in January 2002, she was promised that she would receive additional compensation.

120.    Plaintiff substantially performed all that she was required to do under her agreement with Rothfos Defendants.

121.    Plaintiff has earned commissions on sales she made to Starbucks, as Starbucks instant coffee sales were attributable to the efforts of Plaintiff, who managed Rothfos Defendants' entire business of instant coffee sales for Rothfos Defendants, and also has earned commissions on sales revenue earned by IPI.

122.    In consideration for sales Plaintiff made to Starbucks, and for her services as Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH, Plaintiff earned commissions.

123.    Rothfos Defendants have breached their covenant of good faith and fair dealing in failing and refusing to pay Plaintiff commissions she earned with regard to the Starbucks account as well as the revenue earned by IPI.  Plaintiff is entitled to ten (10) percent of twenty-five (25) percent of Rothfos's revenue from the Starbucks account, as well as ten (10) percent of the sales revenue made by IPI pursuant to her agreement with Rothfos Defendants.

124.    As a result of Rothfos Defendants' breach of contract, Plaintiff suffered and incurred damages equal to the sales commissions wrongfully withheld by Rothfos Defendants in an amount unascertainable at this time because the information needed to calculate this amount is exclusively in the possession, knowledge and control of Rothfos Defendants.

### NINTH CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Breach of Contract for Non-Discretionary Bonuses)

125.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 124 as if fully set forth at length herein.

126.    Federal case law has recognized that implicit in every contract is "a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (1995). This covenant incorporates "any promises which a reasonable person in the position of the promisee would be justified in understanding were included." *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62 (1987). In particular, the covenant includes a promise that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton*, 87 N.Y.2d at 389.

127.    At all times relevant to the Complaint, Plaintiff had an agreement with Rothfos Defendants with regard to non-discretionary bonus payments, which constituted a contract subject to the covenant of good faith and fair dealing.

128.    Plaintiff was promised a yearly non-discretionary bonus of ten (10) percent of twenty (20) percent of all IPI instant coffee and ingredient sales revenue, and later, twenty-five (25) percent of the revenue earned from the Starbucks account.

129.    In addition, when Plaintiff became Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH in January 2002, she was promised that she would receive additional compensation.

130.    Plaintiff substantially performed all that she was required to do under her agreement with Rothfos Defendants.

131.    Plaintiff has earned non-discretionary bonuses on sales she made to Starbucks, as Starbucks instant coffee sales were attributable to the efforts of Plaintiff, who managed Rothfos Defendants' entire business of instant coffee sales for Rothfos Defendants, and also has earned non-discretionary bonuses on sales revenue earned by IPI.

132.    In consideration for sales Plaintiff made to Starbucks, and for her services as Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH, Plaintiff earned non-discretionary bonuses.

133.    Rothfos Defendants have breached their covenant of good faith and fair dealing in failing and refusing to pay Plaintiff non-discretionary bonuses she earned with regard to the Starbucks account as well as the revenue earned by IPI.  Plaintiff is entitled to ten (10) percent of twenty-five (25) percent of Rothfos's revenue from the Starbucks account, as well as ten (10) percent of the revenue made by IPI pursuant to her agreement with Rothfos Defendants.

134.    As a result of Rothfos Defendants' breach of contract, Plaintiff suffered and incurred damages equal to the non-discretionary bonuses wrongfully withheld by Rothfos Defendants in an amount unascertainable at this time because the information needed to calculate this amount is exclusively in the possession, knowledge and control of Rothfos Defendants.

## TENTH CLAIM AGAINST ROTHFOS DEFENDANTS
### (Unjust Enrichment)

135.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 134 as if fully set forth at length herein.

136.    In exchange for her services as a Trader and Co-CEO and Global Commercial Manager of IPI and IPI GmbH, Plaintiff earned commissions and non-discretionary bonuses in the amount of ten (10) percent of twenty-five (25) percent of Rothfos revenue from the Starbucks account, as well as ten (10) percent of the revenue made by IPI.  In addition, when Plaintiff became Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH in January 2002, she was promised that she would receive additional compensation.

137.    Rothfos Defendants obtained a benefit by virtue of Plaintiff's services which were provided throughout her tenure as a Trader for Rothfos and Co-CEO of IPI and Global Commercial Manager of IPI and IPI GmbH, that in equity and good conscience they should not have obtained without compensation to Plaintiff.

138.    Rothfos Defendants have unlawfully retained said commissions and non-discretionary bonuses to which Plaintiff is rightfully entitled.

139.    As a result, Rothfos Defendants were unjustly enriched and Plaintiff suffered and incurred damages equal to the services provided to Rothfos Defendants in an amount unascertainable at this time because the information needed to calculate this amount is exclusively in the possession, knowledge and control of Rothfos Defendants.

## ELEVENTH CLAIM AGAINST ROTHFOS DEFENDANTS
### (Promissory Estoppel)

140.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 139 as if fully set forth at length herein.

141.    Rothfos Defendants clearly and unambiguously promised Plaintiff commissions and non-discretionary bonuses in the amount of ten (10) percent of twenty (20) percent, and later, twenty-five (25) percent of the profits made on the Starbucks instant coffee account, as well as ten percent of the revenue made by IPI. In addition, when plaintiff became Co-CEO of IPI and Global Commercial Manager of IPI GmbH in January 2002, she was promised that she would receive additional compensation.

142.    Plaintiff reasonably and foreseeably relied on this promise.

143.    Plaintiff was injured by reason of her reliance on Rothfos Defendants' promise.

152.    If Korry is not provided the reasonable value of her services, Rothfos Defendants will be unjustly enriched.

153.    As a result of the wrongful deprivation of the reasonable value of Korry's services by Rothfos Defendants, Korry suffered and incurred damages in an amount to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a.    declaring that the acts and practices complained of herein are in violation of the Title VII and the New York Executive Law;

b.    enjoining and permanently restraining these violations of Title VII and the Executive Law;

c.    directing such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

d.    directing Defendants to reinstate Plaintiff in the position Plaintiff would be in but for Defendants' discriminatory and unlawful acts, and to make Plaintiff whole for all earnings she would have received but for Defendants' discriminatory and unlawful treatment, including, but not limited to compensation and benefits including wages, commissions, non-discretionary bonuses, health insurance and other fringe benefits, pension, front-pay, and other lost employment benefits;

e.    directing Defendants to pay Plaintiff compensatory damages for, *inter alia*, mental anguish, emotional distress and humiliation;

f.    directing Defendants to pay Plaintiff punitive damages as provided by Title VII;

144.    As a result of Rothfos Defendants' acts, Plaintiff has suffered and will continue to suffer substantial losses, including loss of past and future earnings, and has suffered other monetary damages and compensatory damages.

### TWELFTH CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Breach of Implied Employee Contract)

145.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 144 as if fully set forth at length herein.

146.    Rothfos Defendants had an agreement to pay Korry commissions and non-discretionary bonuses for deals she procured during her employment as well as for deals which were consummated after her termination based on work done by Korry during her employment.

147.    Rothfos Defendants breached this agreement and the implied contract of good faith and fair dealing in contracts by wrongfully terminating Korry to avoid paying her these earned commissions and non-discretionary bonuses.

148.    As a consequence of the breach of implied employee contract, Korry seeks her unpaid commissions, non-discretionary bonuses, compensatory damages, back-pay, front-pay, and punitive damages plus her attorneys' fees and costs.

### THIRTEENTH CLAIM AGAINST ROTHFOS DEFENDANTS
#### (Quantum Meruit for Commissions)

149.    Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 148 as if fully set forth at length herein.

150.    Rothfos Defendants have benefited as a result of the services provided by Korry.

151.    Korry is entitled to recover the reasonable value of her services under the equitable doctrine of *quantum meruit.*

g.     awarding Plaintiff such interest as is allowed by law;

h.     awarding Plaintiff the costs of this action together with reasonable attorneys' fees; and

i.     awarding such other and further relief as this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated: New York, New York
       June 22, 2007

BERKE-WEISS & PECHMAN LLP
Attorneys for Plaintiff

By: _____
Laurie Berke-Weiss (LB-3445)
488 Madison Avenue, 11th Floor
New York, New York 10022
(212) 583-9500